IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

JAMI TILLOTSON, an individual,

    Plaintiff,

        vs.   Case No.: 4:15-CV-04014-DMR

CITY OF SAN FRANCISCO, a municipal corporation, et al.,

    Defendants.

CERTIFIED COPY

DEPOSITION OF SERGEANT BRIAN STANSBURY

THURSDAY, SEPTEMBER 22, 2016

(SEALED PAGES 109-116 BOUND SEPARATELY)

REPORTED BY: LISA L. JONES, CSR #12982

1

```
 1                      APPEARANCES
 2

 3    FOR THE PLAINTIFF:

 4        LAW OFFICES OF  JOHN L. BURRIS
          Airport Corporate Center
 5        7677 Oakport Street, Suite 1120
          Oakland, California  94621
 6        (510) 839-5200

 7        BY:  DeWITT M. LACY, ATTORNEY AT LAW

 8

 9    FOR DEFENDANTS:

10        CITY OF SAN FRANCISCO
          SAN FRANCISCO CITY ATTORNEY'S OFFICE
11        1390 Market Street, 6th Floor
          San Francisco, California  94102
12        (415)554-4218

13        BY:  MARK D. LIPTON, DEPUTY CITY ATTORNEY

14

15    ALSO PRESENT:

16        Chike Odiwe, Law Clerk

17

18                       --oOo--

19

20

21

22

23

24

25
                                                          3
```

1     Q    What indication did it give?

2     A    They were both black males.

3     Q    Did it give any indication of any tattoos or

4  any special identifying markings that appeared on these

5  suspects bodies?

6     A    The video surveillance or the crime alert?

7     Q    The videos -- the photos that you said you took

8  from the video surveillance.

9          MR. LIPTON:  Objection.  It's vague.

10         Let him explain.

11         THE WITNESS:  So when I issued the crime alert,

12 there were, I believe, two photos in there, which are --

13 you know, a split second snapshot from within a larger

14 video surveillance file -- you know, that lasted a

15 couple minutes or several minutes.  So in the crime

16 alert, I think you can see some unique features of these

17 suspects.

18         MR. LACY:  Q  What unique features?

19    A    Hairstyle, clothing, tone of skin.

20    Q    What tone of skin did it indicate?

21    A    I think it depended upon where they were.  At

22 any given time in the video, I believe when they were

23 outside the door, they appeared to be darker, which are

24 in the photos that I used in the crime alert.  I think

25 when they entered into the building, they were

26

1  slightly -- skin tone was slightly lighter in color, and
2  you could certainly see a little bit more detail.  One
3  of the suspects looked like maybe he had markings on his
4  face, possibly acne or scars of some sort.
5     Q    Was there a particular location of this acne or
6  scars that were indicated in the photos you took?
7          MR. LIPTON:  Just point of information.  I
8  think what we're talking about is, he took screen
9  captures from the video, I think.
10         MR. LACY:  That's my understanding.
11    Q    Is that right, sergeant?
12    A    That's correct.
13    Q    Okay.  So for these photos that you grabbed
14 from the video, did those photos show or indicate some
15 markings on one or more of the suspects' face?
16    A    I'd have to look at the crime alert again.
17    Q    As you sit here right now, do you have any
18 recollection of these photos giving any type of
19 indication of markings or acne on the suspects' face?
20    A    My best recollection is that you can very
21 clearly see the clothing that they're wearing, and you
22 can also clearly see their faces enough, such that if
23 someone was familiar with them or had a prior encounter,
24 that they'd be able to identify them.
25    Q    Had you ever seen these individuals before?

27

 1  those lines.
 2      Q   Okay.  So what were you going to do?
 3      A   I would go into the courtroom next door and see
 4  if, in fact, they were in there.
 5      Q   Okay.  How did you propose to do that, just by
 6  looking at them?
 7      A   Correct.
 8      Q   So you went next door?
 9      A   Yes.
10      Q   You went and looked at them?
11      A   Yes.
12      Q   What did you see?
13      A   I immediately recognized them as the suspects
14  from the crime alert.
15      Q   How did you immediately recognize them from
16  the -- as the suspects from the crime alert?
17      A   The video surveillance that I reviewed was
18  high-definition video surveillance, and the quality of
19  the video, being that it was high-definition, allowed me
20  to get a good look of them -- a good look at them.  So
21  when I saw them in person, I saw that they resembled the
22  persons from the video surveillance.
23      Q   Is there anything about their appearance that
24  gave you an understanding that these were in fact the
25  suspects from the crime alert?

30

1     A    Yes.

2     Q    What specifically?

3     A    Their face and their clothing.

4     Q    What about their face?

5     A    Just as if I were to walk past you on the street, say tomorrow, I would recognize your face. Trying to break it down into specifics of what someone looks like, I guess, I wasn't thinking about it, but when I saw them, I immediately connected the two.

10     Q    Okay. When you saw them, you immediately connected the two, but you can't tell me anything, as you sit here today, specifically indicating what facial features gave you an understanding that these were in fact the suspects; is that right?

15     MR. LIPTON: Objection. That misstates his testimony. You said that all of them did.

17     THE WITNESS: When I looked at their faces, I recognized them as the same persons from the video surveillance.

20     MR. LACY:  Q  But there's nothing -- is there something you can tell me specific, beyond I recognized their faces?

23     A    Mr. Jackson had acne scars. He had a puffy, short Afro. Mr. Harris had shorter hair, was thinner than Mr. Jackson. Mr. Harris had -- didn't appear to

31

1  have any obvious blemishes, like Mr. Jackson had some
2  blemishes.  But on top of these sort of specific
3  characteristics, I looked at them and had no doubt in my
4  mind that these were the same guys.
5      Q    You had never dealt with these guys before?
6      A    No.
7      Q    You had never seen them in person before?
8      A    No.
9      Q    Would you agree that sometimes people appear
10 differently in a video or on a recording as they do in
11 person?
12     A    Very much so.
13     Q    But not these guys?
14     A    Frequently, the quality of video surveillance
15 is poor.  When people are recorded on video
16 surveillance, they're moving, and the images are blurry.
17 In this particular instance, this was very high quality
18 video surveillance, and there were no blurs.  We were
19 able to get a very good look at them, the video
20 surveillance, and they looked almost identical in person
21 as they did in the video surveillance.
22     Q    Okay.
23     A    But on top of their physical characteristics,
24 they were also wearing some of the same clothing in
25 court that day that they were wearing at the time of the

32

1  came between myself and Mr. Jackson.
2      Q    Did he get closer to you than his previous
3  position?
4      A    He was closer to me.
5      Q    Did you believe you had an opportunity to speak
6  to him privately when he was closer to you?
7           MR. LIPTON:  Objection.  It's vague and
8  ambiguous.
9           Answer, if you can.
10          THE WITNESS:  I didn't ask Mr. Davis to come
11 closer to me so that we could speak privately.
12 Mr. Davis' actions were solely of his own doing.
13          MR. LACY:  I understand that.
14     Q    I guess, I'm trying to understand whether or
15 not you saw this as an opportunity to tell him
16 privately, out of earshot from Mr. Jackson, what you
17 needed to detain these fellas for?
18     A    I wasn't able to tell Mr. Davis anything more
19 than I had already told him, but certainly if him and I
20 were going to have a conversation, having him directly
21 in front of Mr. Jackson would not have been where I had
22 the conversation.
23     Q    So, I do have this question, though:
24          You say that you didn't want to compromise the
25 integrity of the investigation; is that right?

47

1   A   That's correct.
2   Q   That's one of the reasons why you didn't reveal
3   more to Mr. Davis, and there's several ways in which you
4   believed the investigation may have been compromised; is
5   that fair to say?
6   A   I did believe there were multiple reasons not
7   to disclose the information.
8   Q   Okay.  Does that mean, yes, there were several
9   ways in which you believed the investigation may be
10  compromised if you disclosed more information to
11  Mr. Davis?
12          MR. LIPTON:  Objection.  It's vague.  It's
13  ambiguous.  It's argumentative.
14          But go ahead and answer.
15          THE WITNESS:  There's any one of the number of
16  actions, that I talked about earlier, that Mr. Jackson
17  or Mr. Harris could have done that would have
18  compromised the investigation if I gave -- if I provided
19  more information than I did.
20          MR. LACY:  Q   Okay.  So if you told
21  Mr. Davis, Hey, I need to photograph these guys
22  because I believe they're wearing the same clothes
23  they did in a burglary that I investigated, and the
24  photos look like them, how -- or why would that have
25  meant the clothes that they were wearing would

48

1  disappear?
2  A People who are suspects in crimes regularly get
3  rid of clothing that they've worn at the time of the
4  incident, because they know that that clothing can be
5  used to convict them of said crimes.
6  Q Okay. Sure. But while you're standing there
7  in the courthouse they can't just get rid of the
8  clothes, can they?
9  A They could have run out of the hallway. Could
10 have run away. Now, we have a thing where we have to
11 chase after them. Their behavior could have escalated.
12 If they thought they were trapped and not free to go,
13 certainly, they might have become more aggressive.
14     My goal was to only take pictures of them,
15 identify them, de-escalate the situation, and let them
16 go on their way, continue to work on my investigation,
17 and resolve this later in another manner.
18 Q Okay. So your concern was maybe that they
19 would flee the scene from 850, out of the presence of
20 yourself and four other officers; am I right?
21 A It's very possible.
22 Q And in doing so, that might also encourage them
23 to disrobe themselves while fleeing out of 850; is that
24 right?
25 A That has happened in other incidents. It's

49

possible that that may have also happened in this incident.

Q    And while they're disrobing themselves and fleeing through 850, you believed that maybe they would give calls on the telephone to other persons that may also be suspected in this larger conspiracy; is that right?

A    Had they known specifically what it was we were looking for, that might have allowed them the opportunity -- or that might have prompted them to tell other people, who are also involved in these burglaries, what was going on.

Q    Okay.

A    People that maybe we hadn't quite yet discovered.

Q    Sure. My question is this, though, Sergeant:
Did you believe that if you told Mr. Davis, listen, I need to photograph these guys because I believe they're wearing the same clothes that they wore when they burglarized this place that I'm investigating, did you believe that the consequence of telling Mr. Davis that was not only that Mr. Jackson and Mr. Harris would flee the scene, the presence of yourself and four other officers, but also that while fleeing, they would call on the phone to a larger group

50

1  A   She took it upon herself to decide that she
2  didn't want me taking photos.
3  Q   Okay.  And she stepped closer to you -- you
4  describe it as being in between the path of -- the
5  direct path of yourself and Mr. Harris; is that right?
6  A   Correct.
7  Q   At this point, what happens?
8  A   I lowered my camera, and in order to
9  de-escalate the situation and to prevent the situation
10 from escalating to something else, I asked Ms. Tillotson
11 to come talk to me off to the side, and I turned, and I
12 took a couple steps, and I said, "Counsel, come talk to
13 me."  And my goal was to talk to her off to the side,
14 answer her questions to the best that I could, so that I
15 could take pictures of Mr. Harris and Mr. Jackson, not
16 have their detention prolonged anymore than it already
17 had been and get them on their way, and then hopefully,
18 address whatever sort of concerns that she might have.
19 Q   Okay.  What were you going to tell her
20 different than what you had already told her when you
21 asked her to step off to the side?
22 A   I didn't know what other questions she had.
23 Q   Of course, if you revealed anything about the
24 investigation, anything further about the investigation,
25 it was compromising, right?

77

1       A    That's correct.

2       Q    It would have been an officer security
3 situation, right?

4       A    Potentially.

5       Q    It might turn into Mr. Harris and Mr. Jackson
6 fleeing through the halls of 850 Bryant; is that right?

7       A    Or fleeing after the fact.

8       Q    Okay. So for that reason, you weren't going to
9 tell Ms. Tillotson anything different than what you had
10 already told her; am I right?

11       MR. LIPTON: It's vague. It's ambiguous. It
12 misstates the witness' testimony.

13       Go ahead and answer.

14       THE WITNESS: I had answered Ms. Tillotson's
15 questions up until this point in time, but she had
16 clearly interjected herself into a situation where
17 neither Mr. Harris or Mr. Jackson had asked her to be
18 involved, and I thought by talking to her off to the
19 side, I might be able to find out what a additional
20 concerns she might have, and it's possible that there
21 may have been some questions that she could have asked,
22 where I could have given her more information.

23       MR. LACY:  Q  Was there a question you had
24 in mind that you wanted to ask Ms. Tillotson when
25 you asked her to step to the side?

78

1       A   It wasn't my goal to ask her questions.  It was
2  my goal to simply ask her one question, which was, "What
3  do you want to know?"
4       Q   Okay.  And then if she says, "I want to know
5  why you're detaining him"; what do you say?
6       MR. LIPTON:  Objection.  It calls for
7  speculation.  It lacks foundation.  It's an incomplete
8  hypothetical.
9       Go ahead.
10      THE WITNESS:  I would have told Ms. Tillotson
11 this is a police investigation.  I can't tell you
12 anything more than that, but do you have any other
13 questions that you might want to ask?
14      MR. LACY:  Q  Okay.  So to that question
15 you would have said what you already said to her; is
16 that right?
17      MR. LIPTON:  Objection.  That misstates his
18 testimony.  It's vague and ambiguous.
19      THE WITNESS:  I think that Ms. Tillotson
20 probably could have asked a lot of other questions.
21      MR. LACY:  Q  But that wasn't my
22 question --
23      MR. LIPTON:  Let him finish his answer.  He's
24 not done with his answer --
25      MR. LACY:  -- that wasn't my question.  That

1  THE WITNESS: I am familiar with the general
2  order on investigative detentions. I don't know if 5.03
3  is the specific number.
4  MR. LACY: Q Okay. Were you aware that
5  under General Order 5.03, Section D, request for
6  identification reads that except in the case of a
7  driver of a motor vehicle, a person's refusal or
8  failure to produce identification is not unlawful
9  and an officer may not threaten a person with arrest
10 solely for his or her refusal to identify himself or
11 herself; were you aware of that at the time?
12 MR. LIPTON: Objection. Compound.
13 Go ahead.
14 THE WITNESS: I'm familiar with that section.
15 MR. LACY: Q What was that?
16 A  I'm familiar with that section.
17 Q  Were you familiar with that at the time?
18 A  Yes.
19 Q  So you knew that neither Mr. Jackson nor
20 Mr. Harris had any obligation to identify themselves to
21 you?
22 MR. LIPTON: Objection. Calls for a legal
23 conclusion.
24 Go ahead and answer.
25 THE WITNESS: In this instance, that wasn't an

102

1  issue, because they did identify themselves, and they
2  did so willingly without any problems.
3         MR. LACY:  Q  My question was:  Did you
4  understand that they didn't have an obligation to do
5  so?
6         MR. LIPTON:  Objection.  Asked and answered.
7         Go ahead.
8         THE WITNESS:  There are points in time, where
9  if you have someone that you know is the suspect of a
10 crime, you need to identify them before you release
11 them, and it's certainly their right not to talk, but in
12 this case, they did, and they willingly identified
13 themselves.
14        MR. LACY:  Q  Okay.  My question was a
15 little more pointed than that and not focused on
16 whether or not they actually did identify
17 themselves.  I think we both understand that's what
18 happened.
19        My question was whether or not you understood
20 at the time you asked them to identify themselves, that
21 they were under no obligation to do so?
22        MR. LIPTON:  Objection.  Calls for a legal
23 conclusion.
24        Go ahead and answer.
25        THE WITNESS:  I certainly understood that they

103

1  had the right and the prerogative not to answer if they
2  chose to do so.
3         MR. LACY:  Q  Okay.  Did you also
4  understand that asking them to pose in certain
5  manners might be prolonging the detention beyond
6  what was needed for the investigation?
7         MR. LIPTON:  Objection.  Vague and ambiguous.
8         But go ahead.
9         THE WITNESS:  I'm sorry.  Can you ask the
10 question again?
11        MR. LACY:  Q  Did you understand that
12 asking Mr. Harris to pose in different positions
13 might be prolonging the investigation beyond what
14 was necessary?
15     A   No, I don't think so.
16     Q   You didn't have that understanding; is that
17 what you mean?
18     A   I don't think it prolonged the detention beyond
19 what was necessary.
20        MR. LACY:  Okay.  I'm going to mark this as --
21 mark it one, because I don't think I took good notes on
22 what the letters are.
23        (WHEREUPON, Plaintiff's Exhibit Number 1 was
24         marked for identification, and is attached
25         hereto.)

104

```
 1    STATE OF CALIFORNIA    )
                             )  SS.
 2
                             )
 3    COUNTY OF SACRAMENTO   )

 4

 5         I hereby certify that the witness, BRIAN
      STANSBURY, in the foregoing deposition appeared before
 6    me, LISA L. JONES, a Certified Shorthand Reporter and a
      disinterested person.
 7
           Said witness was then and there at the time and
 8    place previously stated by me placed under oath to tell
      the truth, the whole truth and nothing but the truth in
 9    the testimony given on the date of the within
      deposition; that the deposition is a true record of the
10    witness' testimony as reported by me.

11         The testimony of the witness and all questions
      and remarks requested by Counsel was reported under my
12    direction and control, caused to be transcribed into
      typewritten form by means of Computer-Aided
13    Transcription.

14         I am a Certified Shorthand Reporter licensed by
      the State of California, and I further certify that I am
15    not interested in the outcome of the said action, nor
      connected with, nor related to any of the parties in
16    said action, nor to their respective counsel.  I am not
      of counsel or attorney for either or any of the parties
17    to the case named in the within caption.

18         IN WITNESS WHEREOF, I have hereunto affixed my
      signature this 26th day of September, 2016.
19

20

21    __/s/Lisa L. Jones_____
      LISA L. JONES
22    Certified Shorthand Reporter
      California License Number 12982
23

24                        --oOo--

25
                                                          118
```