UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMI TILLOTSON,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF SAN FRANCISCO, et al.,<br><br>    Defendants. | Case No. 15-cv-04014-DMR<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 45, 48 |

Plaintiff Jami Tillotson filed a civil rights action claiming that she suffered constitutional violations committed by the City of San Francisco, as well as San Francisco Police Sergeant Brian Stansbury and Officer Brian Kneuker (together, the "Defendant Officers"), in connection with her January 27, 2015 arrest. Defendants now move for summary judgment and Plaintiff moves for partial summary judgment. [Docket Nos. 45 (Defs.' Mot), 48 (Pl.'s Mot).] Having considered the parties' oral argument and written submissions, the court grants Defendants' motion and denies Plaintiff's motion.

**I.     BACKGROUND**

    **A.  Factual Background**

The following facts are undisputed, unless otherwise noted.

At the time of the events in question, Plaintiff Jami Tillotson was a San Francisco Deputy Public Defender. Jaylen Jackson was one of her clients.

Sergeant Stansbury is an investigator for the San Francisco Police Department ("SFPD"). Stansbury created a crime alert related to the January 20, 2015 burglary of an office building and attempted burglary of another office building. The crime alert included photos of the two male suspects at one of the buildings taken from a high-definition surveillance video. According to Stansbury, the photos clearly depicted the clothing worn by the suspects in the photos. One

suspect wore a dark colored jacket with a horizontal bar across the chest. Stansbury also stated that the suspects' faces were clear enough that they could be identified by someone familiar with them. The crime alert provided a description of the burgundy Dodge Magnum car in which the suspects fled, and included Stansbury's contact information. Stansbury distributed the crime alert to the SFPD via department-wide email.

Another SFPD Officer, Edmund Huang, believed that he recognized the two suspects in the crime alert as Jaylen Jackson and Frederick Harris. He emailed that information to Stansbury on January 27, 2015. Later that day, Huang, who was appearing at traffic court at San Francisco's Hall of Justice, saw Jackson and Harris standing outside a courtroom. He observed that Harris was wearing a jacket with a white horizontal stripe, similar to the jacket worn by the suspect in the crime alert photos. Huang took two photos of Jackson and Harris with his cell phone and emailed them to Stansbury, notifying him that the two burglary suspects were presently standing in the hallway at the Hall of Justice. As Huang was departing, he ran into Officer Yamamoto, who worked at Southern Station with Stansbury. Huang told Yamamoto that the suspects pictured in Stansbury's crime alert were at the Hall of Justice, and Yamamoto told Huang that he would relay the message to Stansbury. There is no evidence in the record about whether or when Stansbury received either of Huang's emails. Huang never received a response from Stansbury to either of the emails.

Stansbury was scheduled to testify at the Hall of Justice on the same day. While waiting to testify, Stansbury learned from Yamamoto that the crime alert burglary suspects had been seen by Huang in a different courtroom. Stansbury went to that courtroom to see the two men and immediately recognized them as the suspects from the crime alert. According to Stansbury, the men were wearing some of the same clothing that they had been wearing in the crime alert photos.

Stansbury left the courtroom and called for a plainclothes unit to follow the suspects to see if they drove the car that had been involved in the burglary. After waiting briefly and receiving no response, Stansbury requested backup uniformed officers to assist him in temporarily detaining Harris and Jackson to identify and photograph them. According to Stansbury, he wanted to take photos of the suspects in order to do a side-by-side comparison with the crime scene photos to

make sure that the suspects and clothing matched. He ultimately planned to use the photos to obtain an arrest warrant.

Officers responded to the scene. After Jackson and Harris exited the courtroom, Stansbury identified himself as a police officer, informed them that they were being detained, and asked them to stand against the wall. Both suspects complied. Stansbury then asked them for their identification. Around this time, a San Francisco Deputy Public Defender, Landon Davis, observed Stansbury's interactions with Jackson and Harris and approached Stansbury. He identified himself as an attorney and demanded to know why Jackson was being detained by Stansbury, and if he was free to go. In response, Stansbury told Davis that he was detaining Jackson in order to take photos for a police investigation, that Jackson would be free to go in a couple of minutes, and that that was the only information he could give Davis. Stansbury testified that he was concerned that revealing further information could compromise the active investigation of the two men whom he believed to be serial burglars. He asserted that he was concerned that revealing more information could tip off Jackson and Harris about the investigation and potentially cause them to dispose of evidence such as the clothes they were wearing at the time of the burglary, stolen property, and cell phones. Stansbury further testified that he was worried that revealing the specific details of his investigation could compromise the safety of other police officers who would later become involved in the investigation.

While this was happening, another San Francisco Deputy Public Defender, Sangeeta Sinha, went to the Hall of Justice's holding tank to tell Plaintiff that officers were interrogating her client outside the courtroom.[1] Plaintiff immediately came out into the hallway and Sinha started to film the officers and suspects with her cell phone.

Plaintiff's encounter with Stansbury and eventual arrest was captured on multiple videos taken from approximately the same angle, partially facing the two suspects who are seen standing against the wall, from their left side. Baumgartner Decl., Oct. 6, 2016, Ex. D (Videos 1, 5, 7); Lacy Decl., Oct. 20, 2016, Ex. H (YouTube Video); Lacy Decl., Oct. 6, 2016 (Decl. ISO Pl.'s

---

[1] There is no evidence in the record about the matter(s) in which Plaintiff represented Jackson.

3

MSJ), Ex. A. The videos show Stansbury facing the two men, with Jackson on the left side and Harris on the right. Harris is wearing a dark colored jacket with a horizontal white stripe across the chest. The record also contains a "Combined Incident Video Transcript" from the Office of Citizens Complaints, which appears to be the transcription of two videos taken by Deputy Public Defenders Sinha and Davis. Lacy Decl. Ex. G (Transcript).[2]

      The opening of Defendants' Video 1 shows that Stansbury took notes while speaking to Harris and Jackson. Plaintiff walked over to stand to the left of Jackson, a few feet from the wall, facing Stansbury. Stansbury then told Plaintiff, "[t]his is a police investigation right now. We'll be done in about 2 minutes. If you're going to stand here and interrupt, it's going to take longer, okay." Transcript. In response, Plaintiff said, "[w]ell I'm counsel so I'd like to be present and can you tell me what he's being charged with?" She then stepped away from the wall, closer to Stansbury. Stansbury then stated, "[h]e's not being charged with anything counsel. You're prolonging the detention. . . . [s]o if you stand aside we can be done with this in minutes." Transcript. Stansbury turned away and exited the video frame and Plaintiff stepped toward Jackson, standing next to him. A female voice off-camera is heard saying, "Mr. Harris, Mr. Jackson, you don't have to answer any questions." Transcript. A few seconds later, Plaintiff walked away from where she was standing next to Jackson and exited the frame. She re-entered the frame about ten seconds later and moved to stand at her client's left side. Video 1 ends shortly thereafter. The beginning of Video 7 overlaps with the end of Video 1, opening with Plaintiff exiting the frame. After Plaintiff re-entered the frame, she walked to Harris and said "[inaudible] to get your attorney." Video 7 at 0:16. She then walked back to Jackson, who showed Plaintiff his cell phone while Plaintiff appeared to write something on her hand.

      About 15 seconds later, Stansbury's voice is heard saying "I can just take some pictures and you will be free to go." Transcript. Stansbury appeared to be speaking to Harris, because Harris turned toward the sound of his voice. Plaintiff took a few steps forward and stated, "no, he's not represented by us, but he's saying, he's denying . . .," while shaking her head. Transcript.

---

[2] Neither side objected to the accuracy of the transcript of the videos.

4

At that point, the video shows that Plaintiff had moved a few feet away from the wall, closer to Stansbury and partially in front of Harris. Stansbury is heard saying, "counsel, counsel . . . can I talk to you for a second?" while moving to the left of Plaintiff, to which Plaintiff responded, "sure. I'm right here." Transcript. According to Stansbury, his "goal was to talk to her off to the side, answer her questions to the best that [he] could, so that [he] could take pictures of Mr. Harris and Mr. Jackson, not have their detention prolonged anymore [sic] than it already had been." Stansbury Dep. 77.

Stansbury then said to Plaintiff, "why don't you come over here please?" He positioned himself in front of her with his back to the video camera, and said "[l]ook, you can either step aside, we'll take pictures, we can do this in two minutes. Or we can make this longer." Transcript. Plaintiff did not move aside and responded, "I'm pretty sure that we're okay here. We don't need to have pictures taken. Thank you." Transcript. Stansbury testified that "at that moment in time, it became very clear to [him] that no matter what [he] did, whether it was trying to talk to her and answer her questions or to de-escalate the situation, she was not going to move out of the way." Stansbury Dep. 84. The video shows that Stansbury replied to Plaintiff, "I need you to—no, you're not pretty sure . . . if you continue with this, I will arrest you for resisting . . . [inaudible]." In response, Plaintiff stated, "please do." Transcript.

Plaintiff then said to someone off-camera, "he's going to arrest me." Transcript. Taking handcuffs from an officer nearby, Stansbury told Plaintiff, "you are under arrest. Please turn around and put your hands behind your back," after which she turned and he handcuffed her without apparent incident. Transcript. Another video labeled "YouTube video" shows that after being handcuffed, Stansbury asked the officers, "will one of you guys please take her downstairs and [inaudible]." Transcript. Plaintiff turned back towards Stansbury and said, "[t]here's no 148 here. I'm representing . . . I am representing my . . . I am representing my client here. There is no 148. I am not resisting arrest. There is no 148." Transcript. Another officer, Defendant Kneuker, then asked, "ma'am. Ma'am, please step over here," and escorted Plaintiff down the hallway, away from the cameras. Transcript. Stansbury then took photos of Jackson and Harris.

Video 5 depicts Kneuker holding Plaintiff's upper arm and escorting her to the stairway

5

and down the stairs to a door marked "SFPD." Plaintiff testified that Kneuker was holding her "tightly" and that his grip was "rough enough that it jerked [her] body a little bit." Tillotson Dep. 109. She also testified that Kneuker "was holding [her] so tightly that [she] couldn't move naturally, [and] that [she] was being dragged a little bit." Tillotson Dep. 115.[3]

The Office of Citizens Complaints ("OCC") conducted an investigation into a complaint about Plaintiff's arrest. In a letter to Plaintiff dated December 9, 2015, the OCC summarized its preliminary findings, sustaining Plaintiff's allegation of "Unwarranted Action against a police officer for making an arrest without cause." Lacy Decl. Exs. L; M (Complaint Summary Report). It did not sustain Plaintiff's allegation of "Unnecessary Force against a police officer for using unnecessary force." Lacy Decl. Ex. L.

### B. Procedural History

Plaintiff filed the complaint on September 2, 2015 against the City of San Francisco ("San Francisco), Stansbury, Kneuker, and Sergeant Gary Buckner, Sergeant Douglas Farmer, Officer Patrick Woods, and Officer Matthew Eng. Plaintiff stipulated to dismiss Defendants Buckner, Farmer, Woods, and Eng. *See* Defs.' Mot. at 1, 3. Plaintiff alleges the following causes of action: 1) 42 U.S.C. § 1983 ("section 1983") claim for violation of the Fourth Amendment against Stansbury and Kneuker; 2) 42 U.S.C. § 1985 ("section 1985) claim for conspiracy to violate Plaintiff's civil rights against Stansbury and Kneuker; 3) section 1983 claim for municipal liability against San Francisco; 4) intentional infliction of emotional distress against Stansbury and Kneuker; 5) violation of California's Bane Act, California Civil Code section 52.1 against Stansbury and Kneuker; 6) assault and battery against Stansbury and Kneuker; and 7) negligence against Stansbury and Kneuker.

## II.  LEGAL STANDARDS

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden

---

[3] Both sides refer to Plaintiff's abrupt stop at the top of the stairway, and Kneuker shouting at her, "ma'am, ma'am." However, the evidence cited for this, Tillotson's deposition, is not in the record.

of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott*, 550 U.S. at 380.

Where, as here, the parties have filed cross-motions for summary judgment, "[e]ach motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id*.

### III.   CLAIMS NO LONGER AT ISSUE

In her opposition to Defendants' motion, Plaintiff did not address and/or conceded her claims for section 1985 conspiracy, municipal liability, negligence, assault and battery, and punitive damages. Accordingly, those claims are dismissed with prejudice.

## IV. DISCUSSION

### A. Fourth Amendment Claims

#### 1. Unlawful Seizure

##### a. Legal Framework

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). In *Terry*, the Supreme Court elaborated a three-tier structure of Fourth Amendment jurisprudence. *See United States v. Erwin,* 803 F.2d 1505, 1508 (9th Cir. 1986) (summarizing *Terry*). "The first tier consists of those law enforcement activities, such as police questioning conducted pursuant to valid consent, that do not constitute searches or seizures governed by the Fourth Amendment." *Erwin*, 803 F.2d at 1508.

"The second tier consists of limited intrusions such as pat-downs of the outer clothing (or 'frisks') and brief investigative detentions. To justify these 'limited' searches and seizures, law enforcement officials must possess a reasonable, articulable suspicion that the suspect has recently committed a crime or is about to commit one." *Id.* During a so-called *Terry* stop, police officers are entitled to employ reasonable measures to protect themselves and others in potentially dangerous situations. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056-57 (9th Cir. 1995). However, "[i]nvestigative stops based upon suspicion short of probable cause are . . . constitutionally permissible only where the means utilized are the least intrusive reasonably available." *Kraus v. Pierce Cty.*, 793 F.2d 1105, 1108 (9th Cir. 1986). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

"The third tier comprises 'full scale' searches or arrests requiring probable cause." *Erwin*, 803 F.2d at 1508; *Kraus*, 793 F.2d at 1108 ("Where more than a limited intrusion occurs, an arrest occurs and probable cause is required.").

##### b. Analysis

Plaintiff moves for summary judgment on the ground that there was no probable cause for her arrest. Defendants also move for summary judgment on this claim, arguing that the arrest was supported by probable cause. In the alternative, Defendants assert that they are entitled to summary judgment based on qualified immunity.

"Under the Fourth Amendment, a warrantless arrest requires probable cause." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers*, 452 U.S. 692, 700 (1981)). Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. *Id.* (citing *Beck v. Ohio,* 379 U.S. 89, 91 (1964)). "Alternatively, this court has defined probable cause as follows: when 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.'" *Id.* (citing *United States v. Smith,* 790 F.2d 789, 792 (9th Cir. 1986). While conclusive evidence of guilt is not necessary under this standard to establish probable cause, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir. 1984) (citing *Henry v. United States,* 361 U.S. 98, 101 (1959)). "Probable cause is lacking if the circumstances relied on are susceptible to a variety of credible interpretations not necessarily compatible with nefarious activities." *Gasho v. United States*, 39 F.3d 1420, 1432 (9th Cir. 1994) (citations omitted).

Probable cause must be determined at the time the arrest is made. Facts learned or evidence obtained as a result of a stop or arrest cannot be used to support probable cause unless they were known to the officer at the moment the arrest was made. *City of Portland*, 73 F.3d at 236 (citing *Wong Sun v. United States*, 371 U.S. 471, 482 (1963)). "Where the facts or circumstances surrounding an individual's arrest are disputed, the existence of probable cause is a question for the jury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008) (citing *McKenzie,* 738 F.2d at 1008).

Here, the Defendant Officers contend that probable cause existed to arrest Plaintiff for violation of California Penal Code section 148(a)(1). Section 148 provides that a person "who

9

willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment" is guilty of a misdemeanor. Cal. Penal Code § 148(a)(1). While section 148(a)(1) is "often referred to as a statute prohibiting 'resisting arrest' . . . the statutory prohibition is much broader than merely resisting arrest." *Hooper v. Cty. of San Diego*, 629 F.3d 1127, 1130 (9th Cir. 2011). The elements of the crime are as follows: "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." *Yount v. City of Sacramento*, 43 Cal. 4th 885, 894-95 (2008) (citation omitted). "The offense is a general intent crime, proscribing only the particular act (resist, delay, obstruct) without reference to an intent to do a further act or achieve a future consequence." *In re Muhammed C.*, 95 Cal. App. 4th 1325, 1329 (2002). While section 148(a)(1) "is most often applied to the physical acts of a defendant . . . [it] 'is not limited to nonverbal conduct involving flight or forcible interference with an officer's activities.'" *Id*. (citation omitted) (quoting *People v. Quiroga*, 16 Cal. App. 4th 961, 968 (1993)). Nonetheless, "the statute must be applied with great caution to speech." *Quiroga*, 16 Cal. App. at 968.

### i. Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment on her wrongful arrest claim. She argues that the Defendant Officers lacked probable cause to arrest her for violating section 148(a)(1) for two reasons.

First, she argues that Stansbury's investigation of Jackson and Harris was "unlawful" because Officer Huang had already taken photographs of the suspects at the Hall of Justice and sent them to Stansbury. Additionally, Stansbury described the photographs that he used in the crime alert as "high quality" and sufficiently clear to enable him to immediately recognize Jackson and Harris when he saw them in the Hall of Justice. Therefore, Plaintiff argues, Stansbury already had all the information he needed for his investigation of Jackson and Harris. Since any detention of the suspects was unnecessary and "harassing," Plaintiff "did not interrupt any legitimate police investigation." Pl.'s Mot. at 7-8. This argument is without merit. Plaintiff identifies no law that

10

prohibited Stansbury from taking additional photographs of the suspects as part of his investigation. There is also no evidence in the record that Stansbury had received or seen Huang's photos at the time he detained Jackson and Harris. Moreover, the question of whether Stansbury needed to take additional photos of Jackson and Harris is not relevant to the question of whether Stansbury had probable cause to arrest *Plaintiff* for delaying or obstructing his investigation in violation of section 148(a)(1). The standard for evaluating the lawfulness of the arrest is whether Stansbury had a reasonable belief that Plaintiff committed the offense of delaying or obstructing his investigation. *See Lopez*, 482 F.3d at 1072; *see also Terry*, 392 U.S. at 27-28.

Plaintiff next asserts that she is entitled to summary judgment on her wrongful arrest claim because the Defendant Officers arrested her for engaging in protected speech, to wit, asserting Harris's right to refuse to identify himself by being photographed. She argues that the First Amendment protected her right to object, and that engaging in protected speech alone may not serve as the basis for a violation of section 148(a)(1). Plaintiff cites SFPD General Order 5.03, which provides that a person's "refusal or failure to produce identification is not unlawful, and an officer may not threaten a person with arrest solely for his or her refusal to identify himself or herself." Lacy Decl. ISO Pl.'s MSJ Ex. E.[4]

"The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Houston v. Hill*, 482 U.S. 451, 461 (1987). The Ninth Circuit has observed that "while police . . . may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990); *see also Mackinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995) ("verbal challenges to the police are protected. . . . verbal protests [can] not support an arrest under § 148.").

Notwithstanding this principle, given the existence of material factual disputes, Plaintiff is

---

[4] Stansbury testified that he was familiar with General Order 5.03 and that he understood that Jackson and Harris had the "right and prerogative not to [identify themselves] if they chose to do so." Stansbury Dep. 103-104.

11

not entitled to summary judgment on the theory that she was arrested for verbally objecting to Stansbury taking photos of Harris. The video of the incident shows that after Stansbury said to Harris, "I can just take some pictures and you will be free to go," Plaintiff moved toward Stansbury, and placed herself partially in front of Harris, while voicing her objection and shaking her head. Video 7 at 1:22-28. The Defendant Officers argue that this evidence shows that Stansbury arrested Plaintiff for her physical interference with his attempt to photograph Harris, and not her verbal challenge. While Plaintiff argues that she "did not step in front of Mr. Harris to block [Stansbury's] view," (Pl.'s Opp'n at 16), she does not dispute the fact that she stepped closer to the two men while objecting to Harris's being photographed. The Defendant Officers' argument is buttressed by the fact that Stansbury did not attempt to arrest any other deputy public defender who voiced objection, even though Davis questioned Stansbury about his detention of Jackson, and another person (presumably an attorney) is heard off-camera telling Harris and Jackson that they don't have to answer any questions. Therefore, whether Plaintiff was arrested for protected speech alone is disputed.[5] For these reasons, Plaintiff's motion for summary judgment is denied.

### ii. Defendants' Motion for Summary Judgment

The Defendant Officers contend that they are entitled to summary judgment on Plaintiff's wrongful arrest claim because the undisputed facts show that Plaintiff delayed and obstructed Stansbury's investigation by requiring him to turn his attention to her and away from the subjects of his investigation. Defendants concede that speech alone is insufficient to establish probable cause for a violation of section 148(a)(1), but argue that in addition to her words of opposition, she repeatedly refused to step aside, and also physically obstructed the investigation by positioning herself between Stansbury and Harris, the suspect he intended to photograph.

---

[5] Additionally, the footage of the incident does not show that Harris actually objected to being photographed or identifying himself. It also does not show that Plaintiff objected to Harris identifying himself to the officers. According to the video and transcript, in relation to Stansbury's statement about photographing Harris, Plaintiff said only, "no, he's not represented by us, but he's saying, he's denying . . .", and "[w]e don't need to have pictures taken." Video 7 at 1:22-1:28, 1:40; Transcript. Thus, it is not clear that Plaintiff and Harris actually invoked Harris's right not to identify himself, so this fact is disputed.

12

Video 1 shows that when Plaintiff arrived at the scene of the detention, Stansbury informed her, "[t]his is a police investigation right now. We'll be done in about 2 minutes. If you're going to stand here and interrupt, it's going to take longer, okay." Plaintiff responded by identifying herself as Jackson's counsel and stating, "I'd like to be present and can you tell me what he's being charged with?" Video 1 at 1:18. Stansbury then stated, "[h]e's not being charged with anything counsel. You're prolonging the detention. . . . [s]o if you stand aside we can be done with this in minutes." Transcript. After Stansbury turned away from Plaintiff and exited the frame, Plaintiff returned to her client's side. A short time later, Stansbury's voice is heard on Video 7 saying, "I can just take some pictures and you will be free to go." Video 7 at :1:20; Transcript. The video shows Harris and Plaintiff turning towards the sound of Stansbury's voice, with Plaintiff moving forward and to her left, away from her client and closer to Harris. She then told Stansbury, "no, he's not represented by us, but he's saying, he's denying . . .", while shaking her head. Video 7 at 1:22-1:28; Transcript. At that point, the video shows that Plaintiff moved away from the wall toward Stansbury and partially in front of Harris. *Id*. After that, Stansbury twice asked to speak with Plaintiff, and then said "[l]ook, you can either step aside, we'll take pictures, we can do this in two minutes. Or we can make this longer." Video 7 at 1:30; Transcript. In response, Plaintiff did not move aside and stated, "I'm pretty sure that we're okay here. We don't need to have pictures taken. Thank you." Video 7 at 1:40; Transcript. Following this exchange, Stansbury threatened, "if you continue with this, I will arrest you for resisting . . . [inaudible]," to which Plaintiff responded, "please do." Transcript; Video 7 at 1:43.

The Defendant Officers contend that the evidence shows that Stansbury had probable cause to arrest Plaintiff for delaying or obstructing his investigation by physically and verbally interfering with his attempts to photograph the suspects, citing *Muhammed C.*, 95 Cal. App. 4th at 1330, in support. In *Muhammed C.*, a minor refused repeated requests by police officers to step away from the window of a patrol car where the minor was speaking to a suspect who had been placed in the car. *Id*. at 1328. One of the officers testified that he had to stop processing the suspect's car in order to "deal with" the minor. *Id*. The court upheld the minor's conviction for violating section 148, holding that the trial court reasonably inferred that the minor willfully

13

delayed the officers' performance of their duties based on his refusal to obey the officers' repeated requests that he step away from the patrol car. *Id*. at 1330. Here, the Defendant Officers argue that Plaintiff's actions included stepping toward Stansbury and partially in front of Harris, and communicating her refusal to allow Stansbury to proceed by shaking her head and saying, "[w]e don't need to have pictures taken." Moreover, they argue that Plaintiff refused to comply with Stansbury's requests that she step aside, and after Stansbury warned her of the possibility that she would be arrested, Plaintiff maintained her opposition to Stansbury's request by responding, "please do." The Defendant Officers argue that on this evidence, no reasonable juror could conclude that Stansbury lacked probable cause to arrest Plaintiff for violating section 148(a)(1) since she delayed or obstructed his investigation.

In response, Plaintiff reiterates her argument that she was arrested for purely verbal conduct, arguing that she merely "voice[d] an objection" to Stansbury's attempt to photograph the suspects. Pl.'s Opp'n at 16. While it is undisputed that Plaintiff moved closer to Stansbury while objecting to Harris's being photographed, she argues that she did not raise her hands to block the camera, nor did she step in front of Harris to block him from Stansbury's view. In contrast, Stansbury testified that Plaintiff "blocked [his] ability to take a picture of Mr. Harris," and that Plaintiff was obstructing his view of Harris and his jacket. Stansbury Dep. 67-68. The angle of the video that depicts Plaintiff's movements with respect to Stansbury and Harris does not clearly show whether Stansbury's view of Harris was obstructed in any way. Although it is a close question, viewing the evidence in the light most favorable to Plaintiff, the court cannot say that no reasonable juror could determine that Plaintiff merely voiced her objection and did not physically obstruct Stansbury's investigation. A jury could therefore conclude that Stansbury arrested Plaintiff for her verbal challenge alone, which the Defendant Officers concede is insufficient for a violation of section 148(a)(1). Therefore, summary judgment is denied on that basis.

The court next turns to the question of whether the Defendant Officers are entitled to qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457

14

U.S. 800, 818 (1982). The analysis involves two inquiries. First, taken in the light most favorable to plaintiff, the court must ask whether the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the answer is "no," then the court need not inquire further before ruling that the officer is entitled to qualified immunity. *Id*. If, however, "a violation could be made out on a favorable view of the parties' submissions," the court must examine "whether the [constitutional] right was clearly established." *Id*. The court may exercise its discretion in deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"The linchpin of qualified immunity is the reasonableness of the official's conduct." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1075 (9th Cir. 2011) (citation omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id*.

Under Ninth Circuit law, "[b]ecause the standard for probable cause is well settled, the question with respect to whether an unlawful arrest violated clearly established law is 'whether it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity.'" *Sialoi v. City of San Diego*, 823 F.3d 1223, 1233 (9th Cir. 2016) (quoting *Rosenbaum*, 663 F.3d at 1076) (emphasis in original). Even if the arrest was made without a warrant and without probable cause, however, "the officer may still be immune from suit if it was objectively reasonable for him *to believe* that he had probable cause." *Rosenbaum*, 663 F.3d at 1078 (emphasis in original).

The court concludes that it was objectively reasonable for Stansbury to believe that he had probable cause to arrest Plaintiff for violating section 148(a)(1), even if the belief was in error. After refusing Stansbury's repeated requests to step aside, Plaintiff stepped partially between the

officer and the suspect while shaking her head and voicing her objection to his photographing Harris, saying "[w]e don't need to have pictures taken." Her final response to Stansbury's request, which he accompanied with a warning about possible arrest, was continued opposition—"please do [arrest me]." A reasonable officer in Stansbury's position could have believed that he or she could lawfully arrest Plaintiff for willfully attempting to obstruct or delay the police investigation by preventing Stansbury from taking photographs of the suspects, and that the arrest would not violate any clearly established constitutional right. *See, e.g., Muhammed*, 95 Cal. App. 4th 1325 (affirming section 148 conviction where defendant delayed officers' performance of their duties by refusing repeated orders to move away from patrol car); *Sorgen v. City & Cty. of San Francisco*, No. C 05-03172 TEH, 2006 WL 2583683, at *5 (N.D. Cal. Sept. 7, 2006) (finding qualified immunity applied where the plaintiff repeatedly refused police orders to move back while officer attempted to arrest plaintiff's friend). Stansbury is therefore entitled to qualified immunity, and the court grants the Defendant Officers' motion for summary judgment as to Plaintiff's wrongful arrest claim.

### 2. Excessive Force

The Defendant Officers next move for summary judgment on Plaintiff's excessive force claim, arguing that they used reasonable force in effecting her arrest and escorting her to the holding tank. At the hearing, Plaintiff stated that this claim is based upon the theory that any force used to effectuate her arrest was excessive because her arrest was unlawful, and conceded that her excessive force claim rises and falls with her wrongful arrest claim. Since the court finds that the Defendant Officers are entitled to qualified immunity on Plaintiff's wrongful arrest claim, summary judgment is granted on Plaintiff's excessive force claim.

### B. Intentional Infliction of Emotional Distress

In order to establish a claim for intentional infliction of emotional distress, Plaintiff must show "(1) extreme and outrageous conduct by [Defendants] with the intention of causing, or reckless disregard of the probability of causing, emotional distress"; (2) that Plaintiff "suffer[ed] severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by [Defendants'] outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (citations

16

1  and quotation marks omitted). "A defendant's conduct is 'outrageous' when it is so 'extreme as to

2  exceed all bounds of that usually tolerated in a civilized community." *Id*. at 1051 (citations and

3  quotation marks omitted). Behavior "may be considered outrageous if a defendant . . . abuses a

4  relation or position which gives him power to damage the plaintiff's interest." *Cole v. Fair Oaks*

5  *Fire Dept.*, 43 Cal. 3d 148, 155 n.7 (1987).

6      The Defendant Officers assert that they are entitled to summary judgment on Plaintiff's

7  intentional infliction of emotional distress claim, arguing that such a claim based on an arrest

8  requires Plaintiff to prove that the arresting officer had "no reason" to believe that the person

9  arrested committed an offense. Defs.' Mot. at 17 (citing *Whitaker v. Alameda Cty.*, No. C 12-

10  05923 JSW, 2013 WL 5442200, at *7 (N.D. Cal. Sept. 30, 2013)). Since the Defendant Officers

11  are entitled to qualified immunity on Plaintiff's wrongful arrest claim, Plaintiff has failed to

12  establish the requisite "extreme and outrageous conduct" by Defendants to maintain a claim for

13  intentional infliction of emotional distress. Summary judgment is thus appropriate on this claim.

14      **C. California Civil Code section 52.1 (Bane Act)**

15      Finally, the Defendant Officers move for summary judgment on Plaintiff's California Civil

16  Code section 52.1 claim. California Civil Code section 52.1, the Bane Act, gives rise to a claim

17  where "a person or persons, whether or not acting under color of law, interferes by threats,

18  intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the

19  exercise or enjoyment by any individual or individuals of rights secured by the Constitution or

20  laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal.

21  Civ. Code § 52.1(a). To prevail on a Bane Act claim, a plaintiff must demonstrate, *inter alia,*

22  "intimidation, threats or coercion." *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998).

23      Plaintiff's Bane Act claim is based upon the Defendant Officers' alleged wrongful arrest

24  and use of excessive force. Since the court grants Defendants summary judgment on Plaintiff's

25  arrest and excessive force claims, it also grants summary judgment on Plaintiff's Bane Act claim.

26  *See Reynolds v. Cty. of San Diego*, 84 F.3d 1162, 1170-71 (9th Cir. 1996) ("because there is no

27  federal constitutional violation and no conduct specified which constitutes a state constitutional

28  violation, there is no conduct upon which to base a claim for liability under 52.1.").

## V.     CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety.  Plaintiff's partial motion for summary judgment is denied.

**IT IS SO ORDERED.**

Dated: January 17, 2017



Donna M. Ryu
United States Magistrate Judge